IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

CHARLES MICHAEL HALL        )
INMATE # 03766-036          )
USP TERRE HAUTE           )
P.O. BOX 33                   )
TERRE HAUTE IN 47802       )
                              )
v.                            )  Case # 2:21-CV-93
                              )
UNITED STATES OF AMERICA   )
                              )
and                         )
                              )
THOMAS J. WATSON         )
WARDEN                  )
USP TERRE HAUTE           )
4700 BUREAU ROAD SOUTH    )
TERRE HAUTE IN 47802       )
                              )
and                         )
                              )
MICHAEL SMITH            )
ASSISTANT DIRECTOR       )
HEALTH SERVICES DIVISION   )
UNITED STATES BUREAU OF PRISONS)
320 FIRST STREET NW        )
WASHINGTON DC 20534      )
                              )
           Defendants      )

## *PETITION*

## A. Preliminary Statement

Comes now Charles Michael Hall, who does bring certain Counts of this

action against the United States of America pursuant to 28 U.S.C. § 1346(b)(1), the

1

Federal Tort Claims Act, hereinafter referred to as the FTCA, for certain tortious actions committed against him by the named defendants and others. Mr. Hall also brings certain other Counts of this amended petition against the individual defendants pursuant to the First, Fifth, Sixth and Eighth Amendments to the Constitution of the United States, and ***Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation***, 403 U.S. 388 (1971), to redress the deprivation, under color of Federal law, of plaintiff's rights, privileges, and immunities secured by the Constitution of the United States. Plaintiff seeks money damages to redress and remedy the deprivation of his rights. Plaintiff also seeks injunctive and declaratory relief against the conditions and practices of the defendants as described herein. Finally, plaintiff seeks an award of attorney's fees and costs.

## B. Jurisdictional Statement

1. Certain Counts of this action are brought, and this Court has jurisdiction over said Counts of this action, pursuant to 28 U.S.C. § 1331, the First, Fifth and Eighth Amendments to the Constitution of the United States, and ***Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation***, 403 U.S. 388 (1971).

2. Certain designated Counts of this action are brought pursuant to the FTCA, and over such matters, this Court has jurisdiction per the terms of 28 U.S.C. 1346(b)(1) and 28 U.S.C. 1331(a)(1)

3. All of the actions, omissions and events complained of herein took place within the venue of this Court at the United States Penitentiary, Terre Haute, Indiana, hereinafter referred to as "USP Terre Haute" or at Union Hospital, 1606 N. 7th St., Terre Haute, Indiana 47804, and in particular a special unit of Union Hospital maintained and used for hospital treatment of USP Terre Haute inmates, which will hereinafter be referred to as the "Union Hospital Special Unit".

**C. Identification of the Parties and Statement of Facts Common to All Counts**

1. USP Terre Haute is a prison facility owned by the United States of America and operated by the Federal Bureau of Prisons, hereinafter referred to as the "BOP", through BOP employees, in order to safely and securely house Federal inmates convicted of crimes against the United States.  As such, USP Terre Haute is a place within the special maritime and territorial jurisdiction of the United States.

2. One of the duties owed by the United States to BOP inmates is the providing of medical care which meets the standard of care prevailing in the community.

3

3. USP Terre Haute is designated by the BOP as a Care Level 3 medical treatment center, and as such is capable of providing care for inmate medical patients who are in remission from a serious medical condition.  However, USP Terre Haute does not provide 24-hour health care or daily medical attention to patients with acute conditions.

4. The BOP also operates Medical Care Level 4 facilities to provide proper medical care for inmates who require daily nursing and other care for serious, active medical conditions.

5. Through a contractual agreement between the United States of America and Union Hospital, 1606 N. 7th St., Terre Haute, Indiana 47804, Union Hospital is used for required hospital treatment of USP Terre Haute inmates.  USP Terre Haute inmates who are patients at Union Hospital are provided bedspace in the Union Hospital Special Unit.

6. Plaintiff Charles Michael Hall, hereinafter referred to as either "Mr. Hall" or "Hall", currently is, and at all times relevant to this cause of action was, serving a Federal sentence, and being housed by the BOP at USP Terre Haute.  Mr. Hall's inmate number is 03766-036.

7. Mr. Hall currently is, and at all times relevant to this cause of action was, afflicted with Crohn's disease, having been first diagnosed with the condition in 1993.  Mr. Hall's condition has been described by a health care expert as "a very

debilitating, awful illness and my view is the major horrible event of his (Hall's) life that has affected him (Hall) profoundly" Crohn's disease is an autoimmune disorder which, as suffered in the severe form dealt with by Mr. Hall, resulted in decades of excruciatingly painful inflammation and destruction of the intestinal tract. During the time prior to and during Mr. Hall's incarceration in the BOP, Mr. Hall has undergone eight major surgeries and many other revision procedures. The initial surgeries in the 1990's involved partial removal of the colon, stitching closed the rectum, and creation of a colostomy through the abdominal wall to allow for waste elimination from the stoma into a bag. In the years since, as the disease "marches up the GI tract", there was surgical removal, piece after piece, of the diseased digestive tract, including all of large intestine (colon) and a goodly part of the small intestine (ileum).

8. Though speculations have occasionally been voiced that Mr. Hall might at times be exacerbating his condition through self-abuse, observation of Mr. Hall, even to the point of constant monitoring, never uncovered any indication of such self-abuse; rather, such unfounded suspicions have caused Mr. Hall mental anguish that the gravity of his condition is being ignored and belittled.

9. At all times relevant to this cause of action, Mr. Hall has been and is dependent, for disposal of intestinal waste, upon an ileostomy, which has involved placement of a stoma of the ileum through Mr. Hall's abdominal wall. For this

5

manner of elimination of intestinal waste to operate in a medically standard fashion, the ileum empties fecal waste into a bag and an adhesive wafer is placed between the opening of the bag and the abdominal skin around the stoma to create a seal so the system will not leak fecal waste.  For this system to work in a fashion consistent with the proper medical standard of care, it must not leak.  When the skin around the stoma is maintained in healthy condition, a bag can remain in place and properly function for three to four days.  During the time that the bag is in place, fecal waste is regularly emptied from the bag through a separate drainage port.

10. However, if the skin around the stoma is not in healthy condition, the adhesive wafer cannot maintain a proper seal, and leakage of fecal matter occurs.  Such leakage spills watery fecal material onto the person wearing the ileostomy, causing overwhelming, foul odor, contamination and staining of clothing and bedding, and concomitant embarrassment and shame.  Early replacement of the bag is required to reestablish a seal.  Also, the fecal material which is leaking acts to further infect, inflame and break down the portion of unhealthy skin causing the leak, resulting in the further growth of that area of unhealthy skin, making the leakage problem worse.  It is below the medical standard of care to allow an ostomy system to leak.  The medical standard of care is to treat the wound in a regular manner to heal the wound to reestablish healthy skin in that area, to allow

6

for a proper functioning system to be re-established. If the wound is large, such treatment must be administered by a doctor or a registered nurse, as needed, all day every day, to prevent leakage, to give the wound a chance to heal. If the wound cannot be healed, the medical standard of care is to surgically move the stoma to a new area of the abdomen so that the area of the wound can be allowed to heal and so that a proper system of waste elimination can be established in the new area. It is below the medical standard of care to simply allow the stoma to leak without treatment.

11. Mr. Hall, over the years, has become well-practiced in proper removal and replacement of his ostomy bag, and in properly cleaning and caring for the stoma site. However, Mr. Hall does not have the medical expertise or proper tools available to him to treat an active wound at his stoma site and must depend on expert medical care for such treatment of an active wound.

12. Defendant Thomas J. Watson, hereinafter referred to as "Warden Watson" currently is, and at all times relevant to this cause of action was, the Warden of USP Terre Haute. At all times relevant to this cause of action, Warden Watson was ultimately responsible for supervision of all employees of USP Terre Haute, and was ultimately responsible for the safe care and custody of, and delivery of necessary services to, USP Terre Haute inmates, including Mr. Hall.

13. "Unknown Regional Health Care Administrator" is a designator to identify a person or a number of persons, whose identity/identities is/are currently unknown to Mr. Hall, who is/are employed by the BOP, and tasked with making decisions regarding whether an inmate, like Mr. Hall, should be transferred from a Care Level 3 facility to a Care Level 4 facility.

14. Defendant Michael Smith, hereinafter referred to as "Director Smith", is the Assistant Director for the Health Services Division of the United States Bureau of Prisons who oversees, and is ultimately responsible for, health care delivery at all BOP facilities throughout the country, including USP Terre Haute. At all times relevant to this cause of action, Director Smith was ultimately responsible for supervision of all employees delivering health care services and making health care decisions for inmates of USP Terre Haute, including Mr. Hall. Also, at all times relevant to this cause of action, Director Smith was ultimately responsible and accountable for the health care decisions made for, and the health care provided to, USP Terre Haute inmates, including Mr. Hall.

15. Dr. William E. Wilson, M.D., hereinafter referred to as "Dr. Wilson", is a medical doctor who acts as the medical director for USP Terre Haute, and as such acts as the physician in residence, providing medical care for inmates of USP Terre Haute, including Mr. Hall. Dr. Wilson is deliberately NOT named as a defendant in this cause of action.

16. Nurse May, whose first name is unknown, hereinafter referred to as "Nurse May", is a registered nurse in the employ of USP Terre Haute, whose duties are to provide medical care to inmates of USP Terre Haute, including Mr. Hall, under the direction and supervision of Dr. Wilson.  Nurse May is not named as a defendant at this point because administrative remedies against him have not yet been exhausted.

17. "Unknown Mail Room Worker" is a designator to identify a person or a number of persons, whose identity/identities is/are unknown to Mr. Hall, who is/are employed by the BOP, assigned to USP Terre Haute, whose duties and responsibilities entail processing of incoming and outgoing US Mail for USP Terre Haute inmates in keeping with the rules and regulations set forth by the BOP and by USP Terre Haute.

### *D. Additional Facts in Support of Count I*
### *Medical Malpractice and Torture by Director Smith*

1. In 2018, Dr. Mark Lynch M.D., under contract with the BOP, performed surgery on Mr. Hall at Union Hospital to move the site of Mr. Hall's ileostomy. As part of the surgical process, Dr. Lynch used sutures to close the abdominal skin around the newly situated stoma.  The sutures used were believed to be ones which would dissolve during a short period of time after the surgery.

2. Weeks after the surgery, the sutures had not dissolved, were still in place and the skin in that area was raised and irritated.  Mr. Hall brought this condition to

the attention of USP Terre Haute medical personnel.  After conducting an examination of Mr. Hall, Dr. Wilson directed that a nurse named Nims remove the sutures, and Nurse Nims did in fact remove what sutures which he could detect.

3. Thereafter, substantial healing occurred in the area where the sutures were removed.  However, there was a small portion of the skin in that area, the size of a dime, which remained red and irritated.  This area was on one side of the stoma, intruding upon about 20% of the circumference of the abdominal skin around the stoma.  It was believed that some of the sutures remained in this area which had not dissolved and had not been removed by Nurse Nims.   The decision was made by Dr. Wilson that no further corrective action would be taken at that time, and the area would be monitored with the hopes that the area would heal on its own.

4. Over the subsequent months, the area did not heal, and a bloody wound developed and grew over that time.  As the wound grew, a proper seal for the ostomy bag could not be consistently made, and leakage of fecal material occurred at an increasing rate.  This leakage caused feces odor, staining of clothing and embarrassment for Mr. Hall.  The leakage also further inflamed and infected the wound, causing it to grow in size, and making increasingly more difficult the process of creating a seal for a new ostomy bag.  This resulted in the need for changing bags much more often than the normal once every three to four days.  During this time, Mr. Hall would change bags as soon as he detected the leakage,

and would clean the area as best he could with the limited supplies provided to him.  Mr. Hall also persistently brought the condition to the attention of USP Terre Haute medical staff.

5. Dr. Wilson determined that more aggressive wound care needed to be undertaken.  Dr. Wilson arranged for Mr. Hall to be evaluated and treated by the Wound Care Center at Union Hospital, hereinafter referred to as the Wound Care Center.  Thereafter, Mr. Hall was taken to the Wound Care Center for treatment, on about a weekly basis, more than 30 times in total.  During the first 20 or so visits, the Wound Care Center staff would treat the wound by cutting out dead skin, cauterizing the wound, and applying medications to the wound.  However, during the time period of those 20 or so visits, and despite Mr. Hall's best efforts, leakage still occurred, the wound continued to get infected by the fecal material spilling out onto the wound, and the wound continued to grow in size.  Therefore, over the last 10 or so of Mr. Hall's visits to the Wound Care Center, the state of the wound was observed, but no actual treatment was performed on the wound because the Wound Care Center staff believed that they had no techniques which they could perform which would successfully treat Mr. Hall's wound, and recommended that surgery be done to move the stoma site from the wounded area.

6. Thereafter, Dr. Wilson directed that that Nurse May conduct regular wound treatment, which would include the same techniques used by the Wound

Care Center, particularly cutting away dead parts of skin, cauterization, and treatment with certain medications.  Contrary to these specific directions by Dr. Wilson to Nurse May, Nurse May never performed any such wound care for Mr. Hall.  Mr. Hall repeatedly made requests for treatment from Nurse May in accordance with Dr. Wilson's directions to Nurse May, but Nurse May never responded to Mr. Hall with regard to such requests, and never provided the treatment directed by Dr. Wilson.

7. Over the period described in subparagraphs D-4, D-5 and D-6 above, the wound grew from its original diameter, about the size of a dime, to a size with a diameter comparable to a half-dollar coin, though in an irregular shape.   The wound also intruded into about one-third of the circumference of the abdominal skin around the stoma.  Because of the size of the wound, a proper seal for the stoma bag became more and more difficult to maintain, and leakage occurred at all times of the day and night.  The leakage, when not detected immediately, especially during sleep, resulted in Mr. Hall being soaked in watery fecal material. The stench would be overwhelming from such a large leakage of fecal material. And, the leakage continued to infect the wound causing it to continue to grow, and become a source of constant, stinging pain.  Mr. Hall continued to do his best to properly change the bag as soon as he detected a leak, and to clean the area as best he could.  However, Mr. Hall did not have the tools or training to conduct proper

wound care treatment himself.

8. In August of 2020, Dr. Wilson reexamined the wound with Nurse May present. At that time, Nurse May admitted to Dr. Wilson in Mr. Hall's presence that he (May) had never done the wound treatment that Dr. Wilson had directed, and apologized to Dr. Wilson for his (May's) failure. Nurse May did not, at that time, offer any words, of apology or other, to Mr. Hall. Thereafter, Nurse May still did not conduct any wound treatment as directed by Dr. Wilson.

9. In Sept 2020, Dr. Wilson arranged for Mr. Hall to be seen at the Union Hospital Special Unit by Dr. Brandon Lynch M.D., a colleague of Dr. Mark Lynch, the surgeon who performed the 2018 surgery to set the stoma. At that time, Dr. Brandon Lynch told Mr. Hall that he (Brandon Lynch) and the members of the surgical group would not perform a surgery on Mr. Hall, and Mr. Hall "would just have to live with" the leakage and concomitant suffering.

10. In September and October of 2020, bag leakage became more and more frequent. Mr. Hall persistently reported these incidents to USP Terre Haute medical staff and requested further treatment. In October 2020, Dr. Wilson examined Mr. Hall, and Mr. Hall explained that Nurse May still had not done any wound care treatment for Mr. Hall. At that time, Dr. Wilson himself performed wound care treatment, consisting of cutting away diseased skin, cauterizing the wound and applying medications to the wound. Dr. Wilson indicated to Mr. Hall

that he, Wilson, would return ten to fourteen days later and perform further wound care.  Thereafter, the wound continued to grow in size, and Dr. Wilson never returned to perform further wound care.

11. In light of the facts as set forth in the subparagraphs just above, Dr. Wilson concluded that the care which could be provided at USP Terre Haute did not satisfy the standard of medical care required by Mr. Hall's condition. Particularly, consistent with the appropriate medical standards of care, Mr. Hall's condition required round-the-clock care, care which could not be provided to Mr. Hall at USP Terre Haute.  Dr. Wilson then recommended to the Unknown BOP Regional Health Care Administrator that Mr. Hall be transferred to a Care Level 4 BOP facility where Mr. Hall could receive the daily doctor and nursing care which Hall's condition required.  Dr. Wilson did not have the authority to order such a transfer himself, and it was the Unknown Regional Health Care Administrator who had the authority to direct such a transfer.  However, the Unknown Regional Health Care Administrator rejected Dr. Wilson's recommendation for transfer.  Dr. Wilson then informed Mr. Hall about the rejection of Dr. Wilson's recommendation.

12. On November 22, 2020, in constant pain, and having just suffered yet another foul and humiliating leakage event, Mr. Hall became despondent, hopeless that any relief would ever be provided for this horrible condition, and attempted

suicide by overdosing on aspirin.  Mr. Hall was taken to the Union Hospital Special Unit, and was there treated for the overdose.  No treatment for the wound was provided at that time.  Mr. Hall was returned to USP Terre Haute on November 24, 2020.

13. In the two-and-a-half months since Mr. Hall's return from Union Hospital, Mr. Hall has received no treatment for his wound.  At the end of January, Dr. Wilson examined the wound, referred to it as "nasty", and advised Mr. Hall that he (Wilson) would again start sending Mr. Hall to the Union Hospital Wound Care Center.  Mr. Hall reminded Dr. Wilson that, over the last several visits he made to the Wound Care Center, staff there performed no actual wound care, and expressed concern to Dr. Wilson that the Wound Care Center would continue to fail to actually provide any wound care.  Dr. Wilson indicated that this was the only alternative available to him, and Mr. Hall acquiesced in Dr. Wilson's request that Mr. Hall agree to return to the Wound Care Center.  Since that January meeting with Dr. Wilson, Mr. Hall has not been taken to the Wound Care Center.

14. At present, the wound is the size and shape of Doritos corn chip, and intrudes on more than half of the circumference of the stoma.  Leakage occurs, multiples times each day, without warning.  Mr. Hall cannot sleep for fear about what now happens regularly during sleep, that leakage occurs and Hall is covered in stinking, watery fecal material necessitating changing of bags multiple times per

day.  Such leakage leaves Mr. Hall in a constant state of anxiety, worrying that leakage will occur during sleep, and thereby cover him with fecal material.  Mr. Hall is constantly dealing with the stench, discomfort and embarrassment of such leakage.  Moreover, the wound, as regularly inflamed by persistent leakage of fecal material, continues to grow, and causes a constant, stinging pain which never abates.  And, Mr. Hall cannot self-treat the wound in that he is not trained in wound care treatment, and is not even currently supplied with medications to apply to the wound.

15. Director Smith is the person ultimately responsible for the health care decisions and services described in subparagraphs D-1 through D-14 above.

16. There is no administrative remedy process available to Mr. Hall to address this serious, emergency condition which he suffers.

### E. Count I
### *Bivens Action for Negligent/Deliberately Indifferent Failure to Provide Medically Standard Care by defendant Director Smith*

1. Mr. Hall hereby incorporates by reference all of the facts as set forth in Sections C and D above.

2. Defendant Director Smith, through BOP employees for whom he is ultimately responsible, in making decisions about the medical care to be provided to BOP inmates like Mr. Hall, is required to observe appropriate standards of care followed by physicians in the same or similar circumstances.

3. The preponderance of the evidence establishes that the refusal by defendant Director Smith, through the Unknown BOP Health Care Administrator, to transfer Mr. Hall to a Care Level 4 facility as recommended by Dr. Wilson was negligent and/or deliberately indifferent in that Defendant Director Smith knew or should have known

- that, in light of Mr. Hall's medical condition as described in Section D above, the standard of medical care followed by physicians would be for Mr. Hall to receive the treatment provided in a Care Level 4 BOP facility, including daily nursing care to give all necessary treatment of the wound and monitoring of the seal of the bag to quickly detect leaks and remedy those,

- that, at USP Terre Haute, such a level of care has not been and cannot be provided to Mr. Hall, and

- that, the direct and proximate result of the refusal to approve the transfer of Mr. Hall to a Care Level 4 BOP facility has been and continues to be delivery of health care services to Mr. Hall at USP Terre Haute which are below the prevailing standard of care, and

- that, as a consequence of the actions and inactions of defendant Director Smith, through subordinates, Mr. Hall is suffering adverse conditions of confinement tantamount to torture due to

- o the pain of a wound which is going untreated and cannot heal and grows because it is continually being reinfected,

- o the physical and mental anguish caused by an ileostomy which leaks at all times of the day and night, resulting in profound odor and uncleanliness, as well as shame and opprobrium from others who have to deal with the smell of the leakage,

- o anxiety and loss of sleep and vitality due to worry and anticipation over having leakage occur at unknown and unknowable times.

5. Mr. Hall's constitutional rights under the Eighth Amendment have been violated by the actions of defendant Director Smith as described in subparagraphs E-2, E-3 and E-4 just above.

6. Mr. Hall requests that defendant Director Smith be Ordered to provide medically standard care for Mr. Hall's wound.  In particular, Mr. Hall requests that Director Smith be ordered to transfer Mr. Hall to a BOP Care Level 4 facility to receive treatment in keeping with the medical standard of care.

7. Mr. Hall also requests that he be granted compensatory damages in the amount of $50,000.00 from defendant Director Smith.  Mr. Hall also requests that he be granted punitive damages in an amount equal to the compensatory damages awarded to him, up to the amount of $50,000.00.

8. Mr. Hall further requests that this Court require defendant Director Smith pay Hall's Court costs and reasonable attorney fees.

### F. Additional facts in support of Count II

1. Mr. Hall hereby incorporates by reference all of the facts set forth in subsection C above.

2. Policies in force at USP Terre Haute at all times relevant to this cause of action direct

- that incoming mail addressed to USP Terre Haute inmates be collected from the post office promptly, at least on a daily basis on work days,

- that delivery of mail to inmates may not be delayed and is to be made within 24 hours of its receipt,

- that special mail addressed to an inmate is to be opened by staff only in the presence of the inmate; special mail includes mail from an attorney to an inmate if, on the envelope, the sender is identified as an attorney, and there is set forth on the envelope, in writing, notice that the item is attorney mail and is to be opened only in the presence of the inmate,

- that special mail to inmates is to be sent to the same address as social mail, and the process of collection of mail from the Post Office is not memorialized in writing so as to allow for proper investigation of the persons responsible for committing breaches of policy, and

- that if mail to an inmate is rejected, a returned correspondence form, stating the reason for the rejection, is to be completed and a copy of that form, and the sender's original correspondence, are to be mailed to the sender.

3. The Unknown Mail Room Worker received training on the policies set forth under subparagraph F-2 above, and therefore knew about these policies and the duty the Unknown Mail Room Worker had to follow those policies.

4. In January of 2017, shortly after Mr. Hall began filing administrative grievances over errors of omission and commission related to the meals being served to Mr. Hall, errors began occurring in the delivery of Mr. Hall's mail. These errors involved complete failure to deliver some mail which had been sent to Mr. Hall. Particularly, on a near-weekly basis, one or more of the daily USA Today newspapers subscribed to for Mr. Hall by his attorney would not be delivered to Mr. Hall. The errors also included delay, for weeks at a time, in the delivery of mail, including attorney mail. Mr. Hall informally brought these errors to the attention of USP Terre Haute staff, including directly to Warden Watson, with the hopes of resolving the issues without resort to the formal grievance process. However, Mr. Hall never received any explanation about why these instances of delay and failure in mail delivery were occurring. Those instances of delay and failure in mail delivery continued throughout 2017, 2018, 2019 and 2020.

5. Because of the issues described in subparagraph F-4 above, Frederick A. Duchardt, Jr., Mr. Hall's attorney, began the practice of sending mail to Mr. Hall via USPS Priority Mail, which allowed for tracking of the mail, and recording and reporting by postal authorities of the date and time of delivery of the item to USP Terre Haute workers.

6. On March 2, 2020, Attorney Duchardt sent to Mr. Hall a USPS Priority Mail envelope containing a letter, information and documents for Mr. Hall's signature, all related to an instance in which Mr. Hall, who suffers from a latex allergy, was treated at the Union Hospital Special Unit by nurses who used latex gloves, and thereby triggered an allergic reaction by Mr. Hall.  Attorney Duchardt addressed the envelope to "Charles M. Hall, Inmate #03766-036, USP Terre Haute, P.O. Box 33, Terre Haute IN 47808".  Attorney Duchardt also set forth on the envelope a return address as "Frederick A. Duchardt, Jr., Attorney at Law, P.O. Box 216, Trimble MO 64492".  In addition, Attorney Duchardt set forth on the envelope the words "Attorney Mail please open only in presence of inmate".

7. On March 4, 2020, the USPS reported that, at "6:43 AM" on that date, the item was "delivered, individual picked up at postal facility Terre Haute, IN".

8. Thereafter, Mr. Hall never received the mail described in subparagraph F-6.  Instead, later in March 2020, Attorney Duchardt received a brown manila envelope in his post office box.  The manila envelope contained all of the items

sent by Attorney Duchardt to Mr. Hall and nothing else, and was addressed to Attorney Duchardt using the very return address label cut out from the Priority Mail envelope Attorney Duchardt originally sent on March 2, 2020.

9. Attorney Duchardt inquired of postal authorities, who confirmed delivery of the Priority Mail envelope to USP Terre Haute Staff on March 4, 2020. Moreover, postal authorities examined the manila envelope received by Attorney Duchardt, and indicated that, had postal authorities been the ones returning the item to Attorney Duchardt, that would not have been the manner in which the return would have been made; rather a USPS envelope would have been used, and a copy of a report about the reasons for the return would have also been enclosed.

10. Mr. Hall properly filed an administrative grievance with respect to this matter, which was denied.  Mr. Hall also properly lodged administrative appeals to the denial, which were also denied.

### *G. Count II*
### *Bivens Action for Deliberate Interference with Attorney/Client Communication*

1. Mr. Hall hereby incorporates by reference all of the facts as set forth in Sections C and F above.

2. The Warden Watson had the ultimate duty to Mr. Hall to provide mail addressed to Mr. Hall in accordance with the regulations for same established by the BOP, and described in Section F above.

3. The preponderance of the evidence establishes that Unknown Mail Room

Worker

- on March 4, 2020, collected from the Post Office the Priority Mail packet sent on March 2, 2020 by Attorney Duchardt to Mr. Hall,

- knowing that the correspondence was attorney mail, and was required to be opened only in the presence of the inmate, deliberately opened the mail packet outside Mr. Hall's presence, and

- with the purpose of interfering with the communication between Mr. Hall and his attorney, cut out the attorney return address portion from the priority mail packet, affixed that to a manila envelope, placed the attorney correspondence into that manila envelope, and sent the attorney correspondence back to the attorney.

4. By engaging in the actions set forth in subparagraph F-3, Unknown Mail Room Worker interfered with the confidential communication between Mr. Hall and his attorney in violation of the duties upon him set forth in prison regulations, and in derogation of Mr. Hall's rights under the First and Sixth Amendments to the Constitution of the United States.  Warden Watson was ultimately responsible for these actions by the Unknown Mail Room Worker.

5. Mr. Hall suffered harm in that the incident provided proof that Mr. Hall could not trust that his communications with his attorney would be held confidential in the manner to which Mr. Hall was entitled, and as a consequence

Mr. Hall's lawful communication with his attorney was chilled.  Also, in particular, as a result, Mr. Hall was delayed in seeking redress for the matter addressed in the specific communication which was inferred with.

6. Mr. Hall requests that he be granted compensatory damages in the amount of $5,000.00 from Defendant Warden Watson.

7. Mr. Hall also requests that this Court require that Defendant Warden Watson pay Hall's Court costs and reasonable attorney fees.

8. Mr. Hall additionally requests that an Order be entered by the Court requiring that special mail to USP Terre Haute inmates like Mr. Hall be mailed to a post office box separate from social mail, and that USP Terre Haute establish a procedure whereby the mail room worker who collects such mail on a particular day must log in his/her name verifying his/her collection of that special mail on that day, and such log be maintained as a permanent record by USP Terre Haute.

### Mr. Hall's Certification, Submission, and Jury Trial Request

I, Charles Michael Hall, do hereby request trial by jury, and do hereby attest, under penalty of perjury, that the allegations made in the foregoing are true and correct to the best of my knowledge and belief.  I do further submit this first amended petition signed by me this 8th day of February, 2021.

/s/Charles Michael Hall
CHARLES MICHAEL HALL

Respectfully submitted

//s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.
Mo.Bar Enrollment Number 28868
P.O. Box 216
Trimble MO 64492
Phone:  816-213-0782
Fax:    816-635-5155
e-mail: fduchardt@yahoo.com
ATTORNEY FOR MR. HALL

## *CERTIFICATE OF SERVICE*

I do hereby certify that a copy of the foregoing was e-mailed and posted to

the following on this 16th day of February, 2021

Rachana Nagin Fischer
Assistant United States Attorney
10 W. Market St., Suite 2100
Indianapolis IN 46204
317-229-2414
Fax 317-226-5027
e-mail: rachana.fischer@usdoj.gov

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.